IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 10, 2015 Session

## HORACE E. HOLLIS, JR. v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Dickson County**
**No. 2012-CR-846     Robert E. Burch, Judge**

———————————

**No. M2013-01509-CCA-R3-PC – Filed February 14, 2017**

———————————

This appeal of the denial of post-conviction relief is before this court pursuant to remand by the Tennessee Supreme Court, which vacated this court's August 2015 opinion upholding the post-conviction court's denial of post-conviction relief because the transcript of the post-conviction hearing was not included in the appellate record.[1]  In August 2001, the Petitioner, Horace E. Hollis, Jr., was charged in an eighty (80) count presentment with forty counts of aggravated sexual battery and forty counts of rape of a child.  The sexual abuse was committed against the Petitioner's two minor granddaughters by marriage and, based on the presentment, occurred every other weekend from October 2000 to July 2001.  The counts in the presentment were identical except for the victim's name and date range.  Before trial, the Petitioner's third appointed counsel agreed to sever the counts of the indictment into separate groups of four, one count of rape of a child and one count of aggravated sexual battery for each of the two victims, theoretically resulting in twenty separate trials.[2]  The Petitioner was acquitted at his first trial.  At his second trial, the Petitioner was convicted of rape of a child and aggravated sexual battery of each victim, for which he received an effective sentence of forty (40) years' incarceration.  Following his second trial, the remaining counts of the

———————————

[1] This case has been delayed due to repeated attempts by this court and the Tennessee Supreme Court to obtain a transcript of the post-conviction hearing.  Original post-conviction counsel did not respond to this court's initial orders to supplement the record on appeal; thus, we upheld the post-conviction court's denial of relief because we did not have a post-conviction hearing transcript to review.  Problems obtaining the transcript of the post-conviction hearing in this case persisted even after the Supreme Court ordered the trial court clerk to transmit it within fifteen days of its order remanding the matter.  See Horace E. Hollis, Jr. v. State, No. M2013-01509-SC-R11-PC (Tenn., Dec. 10, 2015) (Order).  Following the issuance of yet another order by this court directing the trial court to resolve the missing transcript issue or conduct a new post-conviction hearing, the appellate court clerk received the transcript on March 2, 2016, and a supplemental transcript of exhibits on July 12, 2016.  Briefing was set and completed on August 25, 2016.

[2] The Petitioner had three separate counsel to represent him, and he challenges the representation of each counsel in this post-conviction appeal.  We will therefore refer to counsel as first, second, and third counsel.

presentment were dismissed by the State. Although the Petitioner presents a multitude of issues for our review, we consider his primary issue to be whether third counsel was ineffective in failing to require an election of offenses in his first trial, which resulted in an acquittal. Because there was no election of offenses in his first trial, the Petitioner further contends that third counsel was ineffective in failing to object to his second trial based on double jeopardy principles. Following a thorough review of the record and applicable authority, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed.**

CAMILLE R. MCMULLEN, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., J. joined. ROGER A. PAGE, J. not participating.

Andrew Love, Tennessee, for the Petitioner, Horace E. Hollis, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Andrew Craig Coulam, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; and Ray Crouch, Jr., Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

A thorough review of the testimony at each of the Petitioner's trials is necessary for the disposition of this case. As an initial matter, prior to trial, third counsel agreed to re-label the numeric counts in the eighty (80) count presentment with letters of the alphabet such that it read Counts A, B, C, and D, rather than Counts 1, 2, 3, 4. At his first trial on August 24, 2010, the Petitioner was tried on Counts 77, 78, 79, and 80. The trial court preliminarily instructed the jury that in Count A of the indictment, the Petitioner was charged with aggravated sexual battery of granddaughter A between the dates of June 30, 2001, and July 1, 2001.[3] In Count B, the trial court instructed the jury that the Petitioner was charged with rape of a child of the same victim between the same dates. In Count C, the trial court broadened the date range and instructed the jury that the Petitioner was charged with aggravated sexual battery of granddaughter B between June 30, 2001, and July 2, 2001. In Count D, the trial court advised that the Petitioner was charged with rape of a child of the same victim for the same dates.

During its opening statement in the first trial, the State argued that it intended to prove that on June 30 and July 1, 2001, the Petitioner committed aggravated sexual battery and rape of a child against both granddaughters, who were five and four years old at the time of the offense. The State continued to explain that the victims would "come to

_____

[3] It is the policy of this court to protect the anonymity of victims of sexual abuse. We will therefore refer to the oldest victim as granddaughter A, and the younger victim as granddaughter B.

-2-

Charlotte every weekend and stay at their grandmother's house, [victims' grandmother's name and her address]. [The victims] would come out on the weekends and during the week they lived home with their mother in Nashville." Detective Billy Joe Gafford was assigned to investigate the instant case based on a referral from Child Protective Services (CPS). He testified that on August 2, 2001, CPS had received a disclosure of "some type of abuse" by the Petitioner's granddaughters, and five days later, on August 7, the victims participated in recorded interviews conducted by CPS. Three days later, on August 10, 2001, Detective Gafford obtained a warrant for the Petitioner's arrest. On August 13, 2001, when Detective Gafford went to the Petitioner's home, a room he rented in the basement of the home of his ex-wife and the victims' grandmother, the Petitioner was not there. Sometime later, after the Petitioner's lease had expired, the victims' grandmother gave Detective Gafford permission to search his basement room. During the search, Detective Gafford found children's toys and video games and a rental car agreement. After consulting with Kim Menke, the Assistant District Attorney (ADA) assigned to the case, Detective Gafford obtained "indictments" against the Petitioner and contacted other law enforcement agencies to assist him in searching for the Petitioner's whereabouts.

At the time the warrants were issued, the Petitioner worked for a Nashville trucking company. Detective Gafford later received information that the Petitioner was working for a carnival and eventually located the Petitioner in Temple, Texas. The Petitioner had been arrested, and Detective Gafford traveled to Texas to testify regarding the Petitioner's outstanding Tennessee arrest warrants. At some point not borne out at trial, the Petitioner was returned to Tennessee. In November 2009, the Petitioner was furloughed to the Veterans Affairs (VA) hospital in Nashville for medical reasons.

On cross-examination, Detective Gafford acknowledged that the Petitioner was not aware of any pending investigation at the time he left, when the warrants were issued. Detective Gafford also never personally interviewed the victims. Detective Gafford acknowledged that he was first notified of the offense on August 2 but that his affidavit of complaint showed that he had been contacted on July 31. A bench conference then occurred during which the prosecutor advised the court that if defense counsel continued this line of questioning, then Detective Gafford "could end up testifying to some dates that would show other counts of the indictment." Defense counsel replied, "that date is not even in the indictment . . . this is well after the indictment." The prosecutor then replied, "Well, I don't know what all she is going to ask and that's fine, but I just wanted to again take the chance to warn Detective Gafford that we're in this gray area here because he only got two arrest warrants and there ended up being an 80 count indictment[.]" After being cautioned by the trial court, defense counsel continued questioning Detective Gafford, who agreed that his affidavit was dated on the same day that the allegation occurred. Detective Gafford clarified that he was contacted or notified of the offense on August 2, and that the listed date on the affidavit was a clerical error.

His affidavit was admitted into evidence. He agreed that the facts as contained in his affidavit regarding the victims' statements of sexual abuse were consistent with their recorded statements given to CPS. He agreed that the victims did not provide dates for the offenses.

The victims' grandmother, who was also the Petitioner's ex-wife, testified that the Petitioner, nicknamed "Buddy," lived in the basement of her home to help defer the house payment. She said that the victims were her granddaughters and, at the time of trial, were fourteen and fifteen years old. In June and July of 2001, the victims lived in Nashville with their mother but tried to visit her every weekend. She would pick them up from Nashville every weekend except for when she had to work. Asked if she picked them up or if they visited her on June 30 or July 1, 2001, she replied, "I did not." She explained that she did not pick them up on the dates alleged in the presentment because she had to work. She said, "They came up there. It had to be on a Sunday and they wouldn't have stayed very long because my daughter's boyfriend would have brought them up there." Her home had three floors: an upstairs, middle floor, and downstairs. The victims had their own bedroom on the middle floor at their grandmother's home. Asked who watched the victims when she was at work, the grandmother said her current husband. Although the Petitioner was "around" the victims upstairs, he was not permitted to "watch after" the victims.

On the day the victims disclosed the sexual abuse, the grandmother was notified of the sexual abuse by a phone call from her daughter. When she received the phone call, the Petitioner was in the room and overheard the conversation. Five minutes after the phone call, the Petitioner left the grandmother's home and never returned. The grandmother did not enter the Petitioner's room until the police arrived. She did not know that the girls had gone into the Petitioner's room to watch movies. She later received a phone call from the Petitioner and urged him to turn himself in to the police but he said, "no." She recalled that at the time of the offense, the Petitioner was working for a trucking company. She said that he was driving a truck and would "come in for about two or three days a month and that's the reason why we let him stay there because we wouldn't see him very much." She confirmed on cross-examination that the victims were not with her on the weekend of June 30. She also said that although the victims were not allowed to be alone with the Petitioner, the victims "went [to his basement apartment], and you know, spent the night with him." When pressed to recall whether the Petitioner was present on the weekend of June 30, the grandmother replied, "I'm trying to think. I can't put a day on it but I just know he comes in . . . three days [] a month and that was it."

Victim A was fifteen years old and lived with her grandmother at the time of trial. In 2001, when she was five or six years old, she lived in Nashville with her mother but

visited her grandmother in Dickson every weekend. Victim A said her grandmother would pick her up from Nashville, or they would meet her grandmother at her office in Nashville. She said she visited her grandmother every weekend for "about a year or two." In 2001, she shared a bedroom on the second floor of her grandmother's home with her sister, Victim B, who was fourteen years old at the time of trial. She confirmed that the Petitioner lived in the basement during that time. In regards to the offense, Victim A said that the Petitioner "would touch us . . . he would put his hands down my pants and he would put his – he would make us – he would always put his finger inside of [her vagina] and I can't remember that much." She said that the offense occurred at her grandmother's home in the Petitioner's room. She said that he would offer candy and toys to her sister and her if they came to his room. Asked if there was ever a time when you and your sister were both in the same room with the Petitioner, Victim A replied, "Yes." The Petitioner showed the victims his penis. Victim A further testified that the Petitioner told her that "if we told anyone that he would kill the people that we told."

On cross-examination, Victim A was asked if she remembered any dates of the offenses. She replied, "I can't remember the exact year but I remember the date. It was July 5." She said the Petitioner would always put his finger inside of her vagina at night while her grandmother was asleep upstairs. She first disclosed the abuse to her paternal grandmother.

Victim B testified that she was fourteen years old and lived with her mother in Antioch at the time of trial. Victim B could not recall the Petitioner's name, but knew that someone lived in her grandmother's basement in 2001. She could not remember anything about the Petitioner and did not recall making a disclosure of sexual abuse. She said she was currently undergoing counseling "because of what happened." She testified that her therapists "help her block it out." When pressed about her interaction with the person who lived downstairs, the victim said that "he just asked me and my sister did we want to stay downstairs." She remembered following her sister downstairs, staying in his room, and him telling her that "if we ever told anybody he would kill whoever we told." Victim B said that it "hurt her head" when she tried to remember and that the therapists were helping her to block it out so she would not have nightmares.

At the request of the State in December 2009, Captain Jim Webb of the Dickson County Sheriff's Department was searching for the Petitioner. Captain Webb located the Petitioner at the Salvation Army Rescue Mission in Nashville. Captain Webb explained that the Petitioner had been dropped off at the VA hospital by an Assistant Public Defender (APD), but never checked in. The hospital "would not divulge any records of [the Petitioner] ever being there" to Captain Webb. The Petitioner was at large for "a few days short of a month." Following the close of the State's proof, an affidavit from an APD was admitted into evidence by stipulation. The affidavit concerned the Petitioner's

visit to the VA in December 2009, and his failure to return to the Dickson County jail. The affidavit stated that the APD transported the Petitioner, who was confined to a wheelchair, to the VA by order of the court. The APD opined that the Petitioner was unable to stand or walk without assistance. The Petitioner was provided with a copy of the trial court's order requiring him to return to the jail if he was not admitted to the hospital and the phone number to the Public Defender's Office in Ashland City. After waiting some time for the hospital administration to locate the Petitioner's records, the APD was advised that it would take another two to two and a half hours before a physician could see the Petitioner and complete the admission process. The APD was unable to wait for the Petitioner to be seen and left the Petitioner at the hospital. Significantly, the APD did not return to his office until some days later. Upon his return, he listened to an urgent message from the Petitioner advising that he was still at the hospital, he had seen a physician, and that the hospital refused to admit him. The Petitioner did not know what to do and did not have the means to return to the jail. The Petitioner requested the APD to come and pick him up from the hospital. After receiving the message, the APD called the hospital but was unable to obtain any information about the Petitioner. The victims' medical records from Our Kids Center were also admitted into evidence by stipulation and published to the jury.

During the state's closing argument, the prosecutor briefly urged the jury to read the contents of the exhibits, the affidavit of complaint, the victims' statements, and the victims' medical records. Their argument otherwise focused on the Petitioner's flight from custody, which they argued was indicative of his guilt. The State's argument did not specifically reference the testimony upon which they were relying to support convicting the Petitioner. In response, the defense's closing argument focused on the fact that the Petitioner was not charged with flight or escape, that the Petitioner did not know any investigation was pending at the time he left in 2001; and that the affidavit from the APD showed that he tried to call back the APD because he did not have a ride back to the jail. Defense counsel also argued that the grandmother testified that the victims were not at her home on the dates alleged in the presentment. She claimed that the victims were there on one day and only for a couple of hours. Finally, defense counsel argued that the victims' medical records did not show any injury and reflected a normal exam result.

Based on the above proof, the jury acquitted the Petitioner on all four counts of the presentment.

A full recitation of the testimony presented at the Petitioner's second trial, which occurred on February 4, 2011, is detailed in this court's opinion on direct appeal. See State v. Horace Hollis, No. M2011-01463-CCA-R3-CD, 2012 WL 1867277, * 1-3 (Tenn. Crim. App. May 22, 2012). In the second trial, the State proceeded on Counts 73, 74, 75, and 76, which alleged that on June 16, 2001, and June 17, 2001, the Petitioner committed

the same sexual offenses as outlined above against his granddaughters. Except for the testimony of Sue Ross, Veronica Gomez, the victims' mother, and an agent from the Tennessee Bureau of Investigation (TBI), the proof at the second trial was substantially the same as the first trial. We recount only the facts, as stated in our direct appeal, that are pertinent to the issues raised in the petition for post-conviction relief.

Former Department of Children's Services ("DCS") case worker Veronica Gomez testified that she received a referral on August 1, 2001, and she arranged for the victims to be interviewed and examined at Our Kids Center. Ms. Gomez interviewed the girls herself on August 7, 2001. She said that during that interview, [Victim A] "disclosed actual sexual penetration . . . by the penis . . . [i]nto the vaginal area," while [Victim B] "only disclosed digital penetration." [Victim A] told Ms. Gomez that the [Petitioner] put his penis "into her monkey all the way and it hurt." The girls indicated to Ms. Gomez that they were afraid of what their mother might say about the abuse.

Sue Ross, a pediatric nurse practitioner employed at Our Kids Center testified that she performed a physical examination of the victims on August 10, 2001. During the examination, [Victim A], who was six years old, disclosed that she had been sexually abused by the [Petitioner], whom she called "Papa Buddy." [Victim A] told Ms. Ross that the [Petitioner] had penetrated her vagina with his fingers and penis and that he had forced her to touch his penis. Ms. Ross characterized [Victim A's] genital examination as normal. [Victim B], who was five years old at the time of the examination, reported to Ms. Ross that "Papa Buddy" "put his finger inside of her" and that he "put his private part on her belly button and said it felt like he was putting warm stuff on her tummy." According to Ms. Ross, [Victim B] said that the [Petitioner] penetrated her vagina with his penis. A genital examination of [Victim B] was normal.

The victims' grandmother and [the Petitioner's] ex-wife, [], testified that after their divorce, [the Petitioner] began renting a room in her basement in October 2000. [The victims' grandmother] and her third husband lived upstairs. [The victims' grandmother] said that the victims spent every other weekend with her at her residence and that [the Petitioner], who was an over-the-road truck driver, arranged his schedule so that he could "be there when they [were] there every other weekend." [The victims' grandmother] recalled that the girls often went into [the Petitioner's] living quarters and that she "thought they [were] down there watching movies 'cause he was always renting movies.'" She said that the

victims had toys and books in the [Petitioner's] living area and that the [Petitioner] brought the children presents. [The victims' grandmother] recalled specifically that the victims were staying at her house on June 16 and 17, 2001, because that weekend was near [Victim A's] birthday and the family gave her a party.

.....

During cross-examination, [the victims' grandmother] said that she occasionally allowed the victims to spend the night with the [Petitioner] in his room and that the girls never acted strangely after doing so. [The victims' grandmother] acknowledged that neither victim ever refused to visit her on the weekends or complained of genital pain or showed any other signs, such as bloody underwear, that they might be being sexually abused.

The victims' mother, [], testified that on August 1, 2001, [Victim A] told her that the [Petitioner] had "touched her." [The victims' mother] said that she "had a nervous breakdown" as a result of the disclosure, and then she telephoned police and her mother.

During cross examination, [the victims' mother] maintained that the girls were not supposed to be around [the Petitioner] because she "knew something was going on but . . . couldn't put [her] finger on it." She said that she allowed the girls to be around the [Petitioner] so long as she was with them.

[Victim A], who was 15 years old at the time of trial, testified that the [Petitioner] "would put his hand down [her] pants and put his fingers . . . inside" her vagina. She said that she thought that the [Petitioner] did this "several" times in his basement room, but she could only remember "like maybe two times." She said that it hurt when he did it. [Victim A] testified that the [Petitioner] told her that if she told anyone about the abuse, he would "kill everybody."

[Victim B], who was four years old at the time of the abuse, testified that she did not "really remember anything" but that the [Petitioner's] name "really upsets [her]." She had no memory at all of any abuse. She said that she had been going to counseling and "trying to bring up the memories" but that she did not "have any memories at all."

-8-

Based on the above proof, the jury convicted the Petitioner of two counts of rape of a child and two counts of aggravated sexual battery, for which he received an effective sentence of forty years' imprisonment. The Petitioner appealed his convictions to this court challenging only the sufficiency of the convicting evidence. His convictions were affirmed by this court; however, we remanded for entry of corrected judgments. See Horace Hollis, 2012 WL 1867277, at *1-4. The Petitioner did not seek further direct review of his convictions from the Tennessee Supreme Court. On December 10, 2012, the Petitioner filed a timely pro se petition for post-conviction relief alleging numerous claims of ineffective assistance of counsel as well as other grounds for relief. Following the appointment of counsel, the Petitioner filed an amended post-conviction petition.

At the April 23, 2013 post-conviction hearing, first counsel, the Public Defender for the Twenty-Third Judicial District, testified that he and two other attorneys from his office were originally appointed to represent the Petitioner. First counsel personally interviewed the Petitioner and discussed the length of time the Petitioner had spent in custody in Texas. At that point, the Petitioner "wanted to go ahead and face the [instant] charges" and advised first counsel to seek and obtain the Petitioner's work records in order to pursue an alibi defense. The work records purportedly showed that "during many of the periods [the Petitioner] was indicted or under presentment," the Petitioner was "out on the road and not even [in Dickson County]." First counsel contacted the Petitioner's employer but was unable to obtain the work records because they were "disposed of" during the period of time that the Petitioner was in federal prison and before he was brought back to Tennessee. Although first counsel could not recall whether anyone in his office actually filed a motion for speedy trial, he researched the issue, discussed it with the Petitioner, and intended to pursue it.

First counsel believed the inability to obtain the Petitioner's work records was "a severe detriment to [the Petitioner's] defense" primarily because witness memories had faded with the passage of time. First counsel generally discussed the difference between questioning a child witness and a teenage witness, and the impact a delay in prosecution would have on both. On cross-examination, first counsel confirmed that the Petitioner was charged by affidavit of complaint with two counts of aggravated sexual battery and two counts of rape of a child on or about July 31, 2001, and that the warrant was sworn out on August 10, 2001. He did not have personal knowledge of the Petitioner's flight from Tennessee but had reviewed similar information in his file. Specifically, he reviewed an August 17, 2001, TBI report contained in pre-trial discovery showing that the TBI had contacted the Petitioner's employer to obtain his work records, but first counsel could not confirm the substance of the report. He agreed that if the Petitioner's employer was unable to provide the Petitioner's work records to the TBI in 2001, his employer would not have been able to provide the work records to the defense when they were later appointed in 2009. First counsel confirmed that "as [the Petitioner travel[ed]

around," he worked under various "alias names," but first counsel did not know the specific names or how many different names the Petitioner used.

On March 8, 2010, first counsel's office was removed from the Petitioner's case based on a conflict. First counsel explained the circumstances in which his office withdrew from representing the Petitioner. In 2009, when the Petitioner was brought back to Tennessee, the defense entered an agreement with the District Attorney's Office to send the Petitioner to the VA hospital. On November 5, 2009, an escape warrant was issued for the Petitioner because he left the VA hospital and did not return to the Dickson County jail as required. According to first counsel, the Petitioner called his office and advised that he was not able to be admitted to the hospital, and they were unable to locate him after that.

Although she could not recall the specific dates, second counsel also worked on the Petitioner's case and left the Public Defender's Office while the Petitioner's case was "still pending." She met with the Petitioner, began gathering records, and prepared his case for trial. She acknowledged that he was facing an eighty count presentment for offenses which occurred in the "early 2000's" and that there was "quite a bit of time between his indictment and when he came back [] to Tennessee to stand trial." Second counsel talked with the Petitioner about the speedy trial issue and whether his extradition from Texas was done properly. The Petitioner told second counsel that he had waived extradition to Tennessee "in the early 2000's." However, counsel explained that the Petitioner was also facing federal charges in Texas at the time that he waived extradition. She said ADA Kim Menke was handling the Petitioner's case at that time. Second counsel never worked with ADA Menke because he had passed away by the time she became involved in the Petitioner's case. She did not file any motions on the Petitioner's behalf.

Third counsel, who represented the Petitioner at his first and second trials, was appointed to represent the Petitioner in 2010. When third counsel was appointed, the Petitioner was facing an additional offense of escape. She became familiar with the charges, reviewed the existing court file, and received the file from the Public Defender's Office. She discussed the delay between the presentment and trial with the Petitioner, who had expressed concern regarding the issue. She did not file a motion for speedy trial "based on the fact there were pending charges against [the Petitioner] for escape [and] because it would have been frivolous." Asked the substance of her conversation with the State regarding "the trying of only certain counts of the indictment at one time," third counsel replied, "It was the district attorney and the judge and that was what the agreement was. We would do four at a time." In response to whether she had done any research on the issue, she replied, "Strategically, I felt it was the best way to proceed." She further opined that "if a jury heard that [the Petitioner] was on trial for 80 counts they

might consider that in and of itself that he was guilty hearing that many at once." Her defense strategy in this regard did not change after she heard the testimony of the child victims in the first trial. Third counsel acknowledged that the social worker and the nurse practitioner did not testify at the first trial; nevertheless, she had "very thoroughly" reviewed the documentation supplied by them in discovery. She acknowledged that she did not file a motion in limine to exclude all or portions of their testimony and did not object to any of their testimony during the Petitioner's first or second trial.

Third counsel further acknowledged that she did not object to certain testimony from Detective Gafford, and she did not know why she did not object. She did not file a motion in limine to exclude evidence gathered from the Petitioner's rented room. She agreed that neither child victim provided a time frame for the offenses during trial and opined it was because they were too young. She did not ask the trial court to require the State to elect or narrow down what offenses they were submitting to the jury at the close of the State's case or object based on double jeopardy principles after the acquittal in the first trial. In third counsel's view, there was not a double jeopardy concern because the rapes occurred on different dates. She contacted the Petitioner's employer to obtain his work records, but his employer was unable to provide any.

Asked about the Petitioner's flight from Tennessee in 2001, third counsel said that she did not consider it to be flight because the Petitioner told her that he did not know there were any allegations or charges at that time. She confirmed that the Petitioner left Tennessee and was arrested in Texas for possession of firearms. She also agreed that he was convicted in federal court and sentenced to twelve years' imprisonment. Finally, she agreed that the Petitioner was serving this twelve-year sentence when he was brought back to Tennessee in 2008.

Detective B.J. Gafford of the Dickson County Sheriff's Department testified that in early 2000, he traveled to Texas twice because he was subpoenaed to testify in federal court. Although Detective Gafford was unsure whether the Petitioner was in federal or state custody, he knew the Petitioner was somewhere in Texas. Detective Gafford inquired to ADA Menke about the Petitioner's case and was advised that the Petitioner would not be coming back to Tennessee anytime soon for trial. Detective Gafford confirmed that the Petitioner was in Texas because he fled Tennessee prior to his indictment. He also confirmed that the Petitioner was charged with escape while he was awaiting trial.

Post-conviction counsel admitted by stipulation with the State a copy of the Petitioner's waiver of extradition and a January 31, 2003, letter from an Assistant U.S. Attorney to ADA Menke. Based on the waiver of extradition, the Petitioner voluntarily waived his rights to extradition and consented to return to Tennessee on April 4, 2002.

He further consented to remain in Texas custody until transfer to Tennessee was arranged. An Assistant U.S. Attorney penned the January 2003 letter, which forwarded "materials" from the Petitioner's federal trial to the state's attorney, ADA Menke. The record also contains an April 20, 2006, detention facility form showing that the Petitioner inquired as to whether there was a detainer lodged against him. The detention facility replied in the negative.

In closing, post-conviction counsel argued that the Petitioner's extradition was flawed because the State knew of his whereabouts as early as 2002 and did nothing until 2008, when he was released from federal custody and brought back to Tennessee. He also argued that "the other two issues are kind of intertwined and . . . complicated on this election of remedies and the double jeopardy issue." He argued that "at no time did anyone ever pin down any dates regarding the alleged incidents that were testified to [at trial]. No testimony, no evidence was presented to the Court, no testimony to the Court . . . regarding any time frame whatsoever." Post-conviction counsel argued that "the failure to raise this issue with the court after the second trial insofar as the first trial was concerned and certainly after the close of the proof in the second trial" amounted to ineffective assistance of counsel. He then argued that the Petitioner was, in fact, "put to trial twice for the same incidents [in violation of principles of double jeopardy] because the general not guilty verdict in the first trial covered everything." The State waived argument.

In denying relief, the post-conviction court issued a thirty-four-page "Memorandum Opinion on Petition for Post-Conviction Relief," which considered each of the Petitioner's claims and summarized the evidence adduced at the evidentiary hearing. In brief, the court concluded that the Petitioner had failed to meet his burden in proving his factual allegations by clear and convincing evidence. It is from this order that the Petitioner appeals.

## ANALYSIS

We begin with an analysis of the Petitioner's claim that third counsel failed to require the State to elect offenses in the Petitioner's first trial and her subsequent failure to object based on double jeopardy and collateral estoppel principles in his second trial. The State argues that the post-conviction court properly denied relief because "the State did not prove that the [victims] were each raped multiple times on June 16 or 17, 2001, only that the [P]etitioner raped them once each. Consequently, [third counsel] could not have been constitutionally compelled to raise election as an issue, and, even if she had, there is no reasonable probability that the outcome of trial would have differed." For reasons that follow, we agree with the State.

In reaching our conclusion, we are guided by the following well-established law pertaining to post-conviction relief. Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal citations and quotation marks omitted); see Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010). A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Vaughn, 202 S.W.3d at 116 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975); Strickland v. Washington, 466 U.S. 668, 687 (1984)). A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address

-13-

the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Id. at 370 (citing Strickland, 466 U.S. at 697).

In State v. Adams, the Tennessee Supreme Court stressed the importance of election and reasoned as follows:

> This Court has consistently held that when the evidence indicates the defendant has committed multiple offenses against a victim, the prosecution must elect the particular offense as charged in the indictment for which the conviction is sought." State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999) (citing Tidwell v. State, 922 S.W.2d 497 (Tenn. 1996); State v. Shelton, 851 S.W.2d 134 (Tenn. 1993); Burlison v. State, 501 S.W.2d 801 (Tenn. 1973)). This election requirement serves several purposes. First, it ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense. Brown, 992 S.W.2d at 391; Burlison, 501 S.W.2d at 803. This right to a unanimous verdict has been characterized by this Court as "fundamental, immediately touching on the constitutional rights of an accused . . . ." Burlison, 501 S.W.2d at 804.

24 S.W.3d 289, 294 (Tenn. 2000); see also State v. Knowles, 470 S.W.3d 416, 423 (Tenn. 2015) (quoting State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994)). The court in Adams also outlined the situations in which an election of offenses is unnecessary:

> When the evidence does not establish that multiple offenses have been committed, however, the need to make an election never arises. To this end, this Court has made a distinction between multiple discrete acts that individually constitute separate substantive offenses and those offenses that punish a single, continuing course of conduct. *In cases when the charged offense consists of a discrete act and proof is introduced of a series of acts, the state will be required to make an election.* In cases when the nature of the charged offense is meant to punish a continuing course of conduct, however, election of offenses is not required because the offense is, by definition, a single offense.

Id. (emphasis added). In addition, "[w]here the State presents evidence of numerous offenses, the trial court must augment the general jury unanimity instruction to insure that the jury understands its duty to agree unanimously to a particular set of facts." State v. Hodge, 989 S.W.2d 717, 721 (Tenn. Crim. App. 1998). Failure to issue a jury instruction on election to insure unanimity constitutes reversible error. Id.

Regarding third counsel's failure to require the State to elect which offense it was relying on, the post-conviction court determined that "the State was not required to elect offenses in this trial" and reasoned as follows:

> The doctrine of election of offenses requires that when there is evidence at trial that a defendant has committed multiple offenses against a victim, the State must elect the facts upon which it is relying to establish each charged offense. State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001). Thus, when the State presents evidence showing that more than one offense occurred, but the indictment is not specific as to which offense the defendant is being tried for, it is the responsibility of the trial court to require the State to elect which offense is being submitted to the jury. State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999); see also State v. Brown, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991).
>
> The only occasion of Petitioner's committing these crimes against the victims admitted in this trial was a single incident against each victim between 16 and 17 June 2001(See recitation of facts by the Court of Criminal Appeals). No other incidents were mentioned. There was, therefore, not necessity to require the State to elect offenses since there was but one specific factual incident contained in the proof.

Applying the above well-established authority to the facts and circumstances of this case, we agree with the post-conviction court and conclude that third counsel was not ineffective in this case. As an initial matter, the failure to elect in the Petitioner's first trial does not amount to error here because that trial ended in an acquittal. Moreover, there was no objection to the generalized nature of the victim's testimony during that trial. Even had there been such an objection, it would not have been sustained as error on appeal. See State v. Qualls, 482 S.W.3d 1 (Tenn. 2016) (holding that election doctrine does not require prosecution to identify a single incident in generic evidence cases, but where a prosecution is based solely on such generic evidence, election doctrine is satisfied by providing jury with a modified unanimity instruction). As to the election issue in the second trial, we conclude that counsel was not ineffective because the indictment was date-specific, the grandmother's testimony was date-specific, and the jury instructions from the trial court on the charged offenses were date-specific. Id. at 16

-15-

(adopting the <u>Jones</u>[4] approach to generic evidence cases and noting that "[w]here the prosecution relies on generic evidence, the jury may not be able to readily distinguish between the various acts, [but the jury] is certainly capable of unanimously agreeing that they took place in the number and manner described.").

The indictment in the second trial charged the Petitioner with one count of aggravated battery and one count of rape of a child for each victim. Even though Victim A's testimony in the second trial was vague and discussed more than one incident of abuse, the grandmother's testimony made it clear that the victims were present in her home on June 16-17 because she remembered having a party for one of the victims. The grandmother also testified that the Petitioner arranged his schedule so he was present in the home when the victims were visiting. Based on all the evidence presented at trial, a rational jury could have inferred that the abuse occurred on the dates listed in the indictment, June 16-17. Because there was no duty to elect in the second trial, the Petitioner is unable to prove the prejudice prong in <u>Strickland</u>. Alternatively, as in <u>Qualls</u>, although the jury did not receive a modified unanimity instruction, based on our careful review of the record, we conclude that any error in failing to require an election in this case was harmless beyond a reasonable doubt.

The Petitioner also claims that third counsel, acting as direct appeal counsel, was ineffective in failing to raise this issue in his direct appeal. We have already concluded that the indictment was date specific, which did not require an election in this case. Accordingly, had third counsel raised this issue on appeal, either through a motion for a new trial or as plain error, a reversal of Petitioner's convictions would not have been warranted. Accordingly, the Petitioner has failed to demonstrate that third counsel provided deficient performance at his second trial and that his second trial was prejudiced by third counsel's deficient performance.

The Petitioner next contends that third counsel's failure to object to his second trial on double jeopardy grounds amounts to ineffective assistance of counsel. Citing <u>Ashe v. Swenson</u>, 397 U.S. 436 (1970), the Petitioner further invokes the doctrine of collateral estoppel and argues that "the single rationally conceivable issue in dispute before the [first] jury was whether the Petitioner had raped and sexually abused the alleged victims[;]" therefore, this issue should have been precluded in his second trial. He further argues against any possible waiver of his rights under the double jeopardy clause because the record does not reflect an intentional waiver. In response, the State contends that the Petitioner's reliance on <u>Ashe</u> is misplaced. The State attempts to distinguish <u>Ashe</u> and argues that, "[n]o matter how similar the victims' testimony was,

---

[4] <u>People v. Jones</u>, 792 P.2d 643, 658 (Cal. 1990).

the charges dealt with separate incidents at separate times.  One can easily conceptualize how one jury could find the evidence insufficient to prove beyond a reasonable doubt that the petitioner raped the girls on June 30 or July 1, 2001, but that another jury could find the evidence regarding June 16 or 17 passed muster."  Additionally, the State contends that the Petitioner failed to carry his burden at the post-conviction hearing because he failed to provide the trial transcripts from both trials for the post-conviction court's review and failed to request the post-conviction court to take judicial notice of the trial transcripts.

We begin our analysis of this issue by recognizing that a jury acquittal results in the greatest protection against subsequent prosecution.  See Ball v. United States, 163 U.S. 662, 671 (1896).  Indeed, "we necessarily afford absolute finality to a jury's verdict of acquittal-no matter how erroneous its decision."  Burks v. United States, 437 U.S. 1, 16 (1978).  This protection is rooted in the Fifth Amendment's Double Jeopardy Clause which provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Const. amend. V; Tenn. Const. art. 1, § 10.  The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence, which it failed to muster in the first proceeding.  Burks, 437 U.S. at 11.  This is central to the objective of the prohibition against successive trials.  Id.  The policy underlying double jeopardy is that the State, with all of its resources, should not be able to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even when innocent he may be found guilty.  See State v. Thompson, 285 S.W.3d 840, 847 (Tenn. 2009) (internal citations and quotation marks omitted) (applying Ashe and concluding based on collateral estoppel that the State was precluded from prosecuting the defendant in his second trial because the issue was previously resolved in his favor in first trial).

The doctrine of collateral estoppel is "embodied in the Fifth Amendment guarantee against double jeopardy," Ashe, 397 U.S. at 445, and "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."  Id. at 443.  In other words, the Double Jeopardy Clause also precludes "relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial."  Yeager v. United States, 557 U.S. 110, 122-23 (2009) (internal citations omitted).  Therefore, "when an issue of ultimate fact has once been determined by a valid and final judgment' of acquittal, it 'cannot again be litigated' in a second trial for a separate offense."  Id. (quoting Ashe, 397 U.S. at 443).  However, the collateral-estoppel component of the Double Jeopardy Clause does not "exclude in all circumstances . . . relevant and probative evidence that is otherwise admissible under the Rules of Evidence simply

-17-

because it relates to alleged criminal conduct for which a defendant has been acquitted." See Dowling v. United States, 493 U.S. 342, 351-52 (1990). The Ashe court warned that careful scrutiny of the record in a prior adjudication is essential in order to determine "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration," and it ruled that an acquittal by a general jury verdict might bar altogether any subsequent prosecution. Ashe, 397 U.S. at 444 (footnote omitted). Accordingly, in assessing whether collateral estoppel applies in a given situation, courts must consider the indictment and pleadings, the evidence, the instructions to the jury, and any other relevant matter "in a practical frame and viewed with an eye to all the circumstances of the proceedings." Thompson, 285 S.W.3d at 847-48 (internal citations omitted). "The burden is on the party asserting collateral estoppel to demonstrate that a specific point at issue has been previously and finally decided." Id.

Regarding third counsel's failure to object based on double jeopardy principles, the post-conviction court stated as follows:

> Petitioner alleges that he was acquitted of four (4) counts of the indictment at his trial on 24 August 2010 and that to try him on four (4) other counts of the same indictment was a violation of his Constitutional protection against double jeopardy and was prohibited by the doctrine of collateral estoppel.
>
> Rule 201, Tenn. R. Evid. allows a trial court to take judicial notice of its own records.
>
> The record of Petitioner's eighty (80) count indictment reflects that the four (4) counts upon which Petitioner was tried on 24 August 2010 were crimes allegedly committed on a different date than the four (4) counts upon which Petitioner was tried on 4 February 2011.
>
> This being the case, the crimes for which Petitioner was acquitted were different crimes than those for which he was convicted in the case *sub judice*. Double Jeopardy and collateral estoppel do not apply.

Some discussion of Ashe is important here because, in our view, the State and the post-conviction court misinterpreted the Petitioner's argument. The habeas petitioner in Ashe was suspected of participating in the robbery of six men who were playing poker in the basement of a home. Ashe, 397 U.S. at 437. Ashe was subsequently charged with six separate robbery offenses, one for each victim. During the trial for the robbery of victim Donald Knight, the proof that an armed robbery occurred and that property had been

-18-

taken was unassailable; therefore, the only issue that remained for the jury was whether Ashe was one of the actual robbers. Id. The jury had been instructed that if it found that Ashe was one of the robbers, he was guilty even if he had not personally robbed Knight. Id. at 439. The jury returned a verdict of not guilty. At the trial for the robbery of one of the other victims, virtually the same evidence was presented as in the Knight trial and the court submitted identical jury instructions. Ashe was convicted. Id. at 440. He subsequently filed a habeas petition with the United States Supreme Court. After defining the concept of collateral estoppel, the Court concluded that the ultimate issue that had been determined at Ashe's first trial was that there was reasonable doubt as to whether Ashe was one of the actual robbers. Id. at 445. The Court held that the second trial violated the collateral-estoppel doctrine because "[o]nce a jury had determined upon conflicting testimony that there was at least a reasonable doubt that [Ashe] was one of the robbers," the State could not present the same or different evidence related to the identification of the robbers in later prosecutions for the robbery. Id. at 446.

Here, as previously discussed, the post-conviction court and the State misinterpreted the Petitioner's argument and focused exclusively on the dates listed in the counts of the presentment, rather than the evidence actually presented at trial. This is evident by the omission of any comparative analysis between the proof presented at the first and second trials, as required by Ashe. In regard to the Petitioner's Ashe-based collateral estoppel argument, it is clear that the jury returned a general verdict of acquittal at the Petitioner's first trial. Therefore, we must examine the entire record of that trial to determine whether any one issue necessary to the judgment in the Petitioner's second trial was actually decided in the Petitioner's favor. In doing so, we are mindful that the critical question now before us is whether the Petitioner has demonstrated that "a rational jury could [not] have grounded its verdict upon an issue other than that which the [Petitioner] seeks to foreclose from consideration." Ashe, 397 U.S. at 444.

In order to sustain a conviction for rape of a child, the State was required to prove the unlawful sexual penetration of the victims by the Petitioner and establish that the victims were more than three (3) years of age but less than thirteen (13) years of age. See T.C.A. § 39-13-522. Sexual penetration is established by showing "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body[.]" See T.C.A. § 39-13-501(7). Thus, for the jury to convict the Petitioner of child rape, it had to find that the State proved beyond a reasonable doubt that the victims were less than thirteen years of age and that they were sexually penetrated by the Petitioner.

Here, there is no question that the victims were under the age of thirteen at the time of the offense. The proof was also unassailable that the identity of the perpetrator was in fact the Petitioner. Thus, the only conceivable issue for the jury to decide was

whether the Petitioner digitally penetrated both victims and when this offense occurred. On this issue, the proof at the first trial consisted of Victim A testifying that the Petitioner "would touch us . . . he would put his hands down my pants and he would put his – he would make us – he would always put his finger inside of [her vagina] and I can't remember that much." She said that the offense occurred at her grandmother's home in the Petitioner's room. Victim A was asked if she remembered any dates of the offenses. She replied, "I can't remember the exact year but I remember the date. It was July 5." She said the Petitioner would always put his finger inside of her vagina at night while her grandmother was asleep upstairs. The testimony from the detective and the victims' medical exams showed that the victims did not provide dates for the described offenses.

Upon further comparison of the evidence presented at the second trial, we conclude that there is no double jeopardy violation because the charges in the first trial listed different dates than the charges in the second trial, and therefore, charged distinct offenses. Moreover, the holding in Ashe does not apply to this case because the evidence in the second trial was substantially different than that presented in the first trial. In the second trial, the State presented additional testimony from a nurse practitioner, who discussed the victims' examination and her findings. Victim A disclosed to the nurse that she had been sexually abused by the Petitioner. She told her that the Petitioner had penetrated her vagina with his fingers and penis and that he had forced her to touch his penis. Victim B told the nurse practitioner that the Petitioner "put his finger inside of her" and that he "put his private part on her belly button and said it felt like he was putting warm stuff on her tummy." Victim B also reported that the Petitioner penetrated her vagina with his penis. A social worker also testified and explained that both victims had disclosed sexual abuse by the Petitioner. The victims' mother also testified that they disclosed the abuse to her. To be clear, Ashe dealt with one offense on a single date against several victims where identity was the only issue. In contrast, the Petitioner's case deals with the same victims for offenses occurring on different dates. Because the offenses in the Petitioner's case occurred on different dates, Ashe does not apply, and there is no double jeopardy violation. Even if Ashe, 397 U.S. at 444, somehow applied, a rational jury could have grounded its verdict upon an issue other than that which the Petitioner seeks to foreclose because the evidence from the first trial established that the victims, if they were at their grandmother's house the weekend of June 30-July 1, were only present for a few hours during the day on Sunday while they were with their mother, and Victim A testified that the offenses always occurred at night. Therefore, the jury could have concluded that the Petitioner was simply not guilty of the offenses that were alleged to have occurred on June 30-July 1, rather than concluding that he did not sexual abuse the children. After careful review of this record, the Petitioner has failed to meet his burden of establishing that the unlawful digital penetration of the victims by him was decisively resolved in his favor. Accordingly, the Petitioner has failed to establish prejudice.

We will now address the Petitioner's remaining issues. The Petitioner additionally argues that he received ineffective assistance of counsel based on third counsel's failure to (1) file a motion to dismiss based on a violation of the right to a speedy trial; (2) investigate the claim that the Petitioner's 2001 employment records were unavailable because they allegedly had been destroyed over the course of time; (3) object to the testimony of Veronica Gomez and Sue Ross regarding their interviews with the child witnesses; (4) object to the "silent" testimony of the victim, [Victim B].; (5) object to alleged prosecutorial misconduct; and (6) object to alleged after-hours trial proceedings; (7) object to the severance in this case. For the reasons that follow, the Petitioner is not entitled to relief on any of these issues.

**1 & 2. <u>Violation of Right to Speedy Trial and Failure to Investigate Employment Records.</u>** We have combined the Petitioner's claims that counsel failed to file a motion to dismiss based on a speedy trial violation and counsel failed to investigate Petitioner's 2001 employment records because they are related and supported by the same argument in the Petitioner's brief. The Petitioner argues that first, second, and third counsel provided ineffective assistance of counsel in failing to file a motion to dismiss based upon a violation of the Petitioner's right to a speedy trial. Here, the Petitioner insists that his 2001 employment records would have confirmed that he was at work out of State as an "on the road truck driver" at the time of the offenses. However, these records were apparently no longer available at the time of his trial in 2010. Had first and second counsel filed a motion to dismiss based on a speedy trial violation, the Petitioner argues that he would have been able "to build a pre-trial record" and establish prejudice. Moreover, the Petitioner argues that first and second counsel "abandoned" him when they filed a motion to withdraw from his case. The State combined its response to this issue with the Petitioner's ineffective assistance of counsel claim against third counsel and contends that the Petitioner is not entitled to relief.

Both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution guarantee an accused the right to a speedy trial. <u>See</u> U.S. Const. amend VI; Tenn. Const. art. 1, § 9. The right to a speedy trial is also statutorily protected in Tennessee. <u>See</u> T.C.A. § 40-14-101 ("In all criminal prosecutions, the accused is entitled to a speedy trial and to be heard in person and by counsel."). In addition, Rule 48(b) of the Tennessee Rules of Criminal Procedure provides that the court may dismiss the indictment if there is unnecessary delay in bringing a defendant to trial. Tenn. R. Crim. P. 48(b). "The purpose of the speedy trial guarantee is to protect the accused against oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that evidence will be lost or memories diminished." <u>State v. Utley</u>, 956 S.W.2d 489, 492 (Tenn. 1997) (citing <u>Doggett v. United States</u>, 505 U.S. 647, 654 (1992)).

The constitutional right to a speedy trial is not implicated until there is an arrest or a formal accusation from a grand jury. State v. Simmons, 54 S.W.3d 755, 758-59 (Tenn. 2001) (citing Utley, 956 S.W.2d at 491). When evaluating claims of a speedy trial violation, we apply the four-part balancing test set forth in Barker v. Wingo, 407 U.S. 514 (1972); see also State v. Bishop, 493 S.W.2d 81, 83-85 (Tenn. 1977) (adopting the Barker analysis in Tennessee). The Barker factors are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right to a speedy trial; and (4) the prejudice to the defendant because of the delay. Barker, 407 U.S. at 530; Simmons, 54 S.W.3d at 759. "The factors relevant to a speedy trial inquiry are interrelated and depend upon the particular circumstances of each case." Simmons, 54 S.W.3d at 762 (declining to articulate a bright-line rule for speedy trial claims); see also Barker, 407 U.S. at 530 ("A balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis."). If a reviewing court concludes that the accused has been denied the right to a speedy trial, the only remedy is reversal of the conviction and dismissal of the indictment. See Barker, 407 U.S. at 522; Bishop, 493 S.W.2d at 83. We review a trial court's determination of whether a defendant's right to a speedy trial was violated under an abuse of discretion standard. State v. Hudgins, 188 S.W.3d 663, 667 (Tenn. Crim. App. 2005) (citing State v. Jefferson, 938 S.W.2d 1, 14 (Tenn. Crim. App. 1996)); State v. Easterly, 77 S.W.3d 226, 236 (Tenn. Crim. App. 2001); State v. Gai D. Kuot, No. M2012-01884-CCA-R3-CD, 2013 WL 4539020, at *10 (Tenn. Crim. App. Aug. 26, 2013).

In regard to this issue, the post-conviction court determined as follows:

> The Office of the Public Defender was required by law to withdraw from representing Petitioner because said office had previously represented a witness to Petitioner's escape charge. This was not a willful abandonment of Petitioner but an action required by law. The issue is without merit.
>
> . . . .
>
> On cross-examination, [prior counsel] testified that the crime occurred on 31 July 2001 (He was obviously referring to another count of the indictment) and the warrant was issued on 10 August 2001. Petitioner fled the state about that time. Petitioner was later arrested working for a carnival in Temple, Texas in 2002. [Prior counsel] testified that Petitioner had used various alias names after he fled the state. The recitation of facts by the Court of Criminal Appeals reflects that Petitioner was arrested in April of 2002 working for a carnival in Temple, Texas under his own name. [Prior counsel] testified that Petitioner was in Federal Prison in Texas before being brought back to Tennessee in 2008. The record does not show

-22-

when Petitioner went to Federal Prison. It does show that Petitioner waived extradition on 4 April 2002. After Petitioner was brought back to Tennessee, he was released from jail on a furlough for medical treatment at the Veterans Hospital in 2009. Petitioner called the Office of the Public Defender and left a message that the VA would not admit him. The Office of the Public Defender did not hear from Petitioner thereafter. Petitioner was ultimately rearrested and stood trial the first time in late 2010. During the interim between when Petitioner was incarcerated in Federal Prison in Texas and when Petitioner was transported back to Tennessee to stand trial for these charges, the assistant attorney general handling Petitioner's case died unexpectedly. Apparently, Petitioner's case was not assigned to another assistant attorney general for a protracted period of time or the assistant to whom it was assigned did not pursue Petitioner's extradition.

After engaging in a lengthy weighing analysis of the Barker factors, the post-conviction court determined that the Petitioner had failed to establish that prior counsel was ineffective in relation to this issue and reasoned as follows:

> The record establishes that, when Petitioner was returned to Tennessee, his work records were no longer available. What is not shown in the record is at what point in time these records became unavailable. It is certainly within the realm of possibility that these records would not have been available had Petitioner been returned to Tennessee within a year of indictment. In the absence of proof, there is no way to know. Petitioner has failed to demonstrate that he was prejudiced in the trial of his case by the delay in bringing him to trial. Petitioner has the burden of proving his factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f). Thus, Petitioner has failed to establish that his presentation of his case was prejudiced by the delay in bringing him to trial. In fact, the testimony of the victims, particularly the younger victim, contained in the facts found by the Court of Criminal Appeals in Petitioner's appeal of his conviction indicates that the delay may have benefitted Petitioner.

In resolving this issue, we must now turn to analyze each of the Barker factors to determine whether third counsel was deficient for failing to move to dismiss the Petitioner's indictment based on a violation of his speedy trial rights.

A. Length of Delay. We first consider the length of the delay. The Tennessee Supreme Court has held that "either a formal indictment or information or else the actual restraint imposed by arrest and holding to answer a criminal charge" triggers the speedy trial analysis. Utley, 956 S.W.2d at 492 (quoting State v. Wood, 924 S.W.2d 342, 345

(Tenn. 1996)); see also State v. Baker, 614 S.W.2d 352, 354 (Tenn. 1981) (holding that "no speedy trial rights arise until after formal accusation, either by arrest or by grand jury action."). A post-accusation delay of one year or more is "presumptively prejudicial" and will trigger a speedy trial inquiry. Utley, 956 S.W.2d at 494. "The reasonableness of the length of the delay depends on the complexity of the case." Wood, 924 S.W.2d at 346. "[D]elay that can be tolerated for 'an ordinary street crime' is generally much less than for a serious, complex felony charge." Easterly, 77 S.W.3d at 235 (quoting Barker, 407 U.S. at 530-31). However, the presumption that the delay has prejudiced the defendant intensifies over time. Simmons, 54 S.W.3d at 759 (citing Doggett, 505 U.S. at 652; Utley, 956 S.W.2d at 494; Wood, 924 S.W.2d at 346).

Here, the Petitioner was charged via presentment on August 28, 2001, and extradited to Tennessee in December 2008. The reason for the seven-year-delay between the Petitioner's presentment and arrest appears to be a combination of his arrest and incarceration in another jurisdiction, and the death of the Assistant District Attorney assigned to handle his case. We acknowledge that the Petitioner waived extradition to Tennessee and consented to return to Tennessee as early as April 4, 2002. We further acknowledge that as early as April 20, 2006, the Petitioner inquired as to whether there was a detainer lodged against him, and no action was apparently taken on this matter until 2008. In 2010, two years later, the Petitioner was acquitted in his first trial. In February 2011, the Petitioner was convicted of the instant offenses. As acknowledged by the post-conviction court, a post-accusation delay of seven years warranted a speedy trial inquiry. However, under the circumstances, the delay was not necessarily unreasonable when compared to other cases. See Wood, 924 S.W.2d at 346 (delay of thirteen years did not violate right to speedy trial); Barker, 407 U.S. at 533-36 (five-year delay between arrest and trial did not violate right to speedy trial). In our view, the length of the delay, while extensive, weighs against the State.

B. Reason for Delay. The next factor to consider is the reason for the delay. The reasons for post-accusation delay generally fall within four categories: (1) intentional delay to gain a tactical advantage over the defense or to harass the defendant; (2) bureaucratic indifference or negligence, including lack of due diligence; (3) delay necessary for the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense. Wood, 924 S.W.2d at 346-47; see also Simmons, 54 S.W.3d at 759. Deliberate delay is weighed heavily against the State. Negligent delay is also weighed against the State, but less heavily than intentional delay. Delay necessary for effective prosecution, such as locating a missing witness, is considered valid and not weighed against either party. A delay caused or agreed to by the defendant is weighed against the defendant. Wood, 924 S.W.2d at 346-47; see also Barker, 407 U.S. at 531.

Here, the record shows the Petitioner was in custody in another jurisdiction, resulting in a seven-year-delay of his trial. However, it is equally clear that the Petitioner requested to be extradited back to Tennessee as early as 2002, and the State did not take any action to return the Petitioner to Tennessee until the Petitioner completed his federal sentence. We also recognize that when the Petitioner was ultimately brought back to Tennessee, the court furloughed him to the VA hospital for medical treatment. The Petitioner subsequently violated the court order, did not return to jail, and was missing for nearly a month. We must attribute the initial failure to procure the Petitioner for trial to the State and conclude that the seven-year-delay resulted from a lack of due diligence by the State. Thus, this factor weighs against the State, although not heavily because there is no evidence of intentional delay to gain a tactical advantage.

C. <u>Assertion of Right</u>. The third factor to evaluate is whether the accused asserted the right to a speedy trial. Assertion of the right weighs strongly in favor of the defendant, while failure to assert the right will make it difficult to prove that the right has been denied. <u>Simmons</u>, 54 S.W.3d at 760 (citing <u>Barker</u>, 407 U.S. at 53132). Here, it appears that the Petitioner formally asserted his right to a speedy trial on January 7, 2008, when he filed a pro se motion to dismiss. In 2010, he also filed a pro se motion for "issuance of a writ of habeas corpus" based on the State's failure to prosecute in a timely manner. The record does not contain the trial court's rulings on the Petitioner's pro se filings. The Petitioner was returned to Tennessee in November 2008, appointed counsel in January 2009, and his first trial was in 2010. While this factor weighs in favor of the Petitioner, it does not weigh heavily in his favor. <u>See</u> <u>Gai D. Kuot</u>, 2013 WL 4539020, at *12 ("[T]his factor weighs in the defendant's favor. However, the delay prior to the defendant's filing this motion was necessary, rational, and, in some regards, attributable to the defendant. Moreover, once the trial court heard the defendant's motion, it ruled that the defendant's case would be heard at its next trial date and the case commenced as scheduled within five months of the hearing.").

D. <u>Prejudice from Delay</u>. The final factor, the prejudice to the accused caused by the delay, is the most important to consider in the speedy trial inquiry. <u>Simmons</u>, 54 S.W.3d at 760 (citing <u>Barker</u>, 407 U.S. at 532; <u>Wood</u>, 924 S.W.2d at 348; <u>Bishop</u>, 493 S.W.2d at 85). The prejudice factor is assessed in light of the interests that the right to speedy trial is designed to protect. <u>Barker</u>, 407 U.S. at 532 (identifying three interests of the accused: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired."); <u>see also</u> <u>Simmons</u>, 54 S.W.3d at 760 (citing <u>Bishop</u>, 493 S.W.2d at 85). The Tennessee Supreme Court has observed that "the most important issue concerning prejudice to the defendant is the impairment of the ability to prepare a defense." <u>Berry</u>, 141 S.W.3d at 568 (citing <u>Baker</u>, 614 S.W.2d at 356); <u>see also</u> <u>Barker</u>, 407 U.S. at 532 ("Of these, the most serious is the last, because the inability of a defendant adequately to

prepare his case skews the fairness of the entire system."). "Faded memories, erosion or loss of potentially exculpatory evidence, and loss of potentially favorable witnesses are all possible results of a lengthy delay." Wood, 924 S.W.2d at 346.

Courts have recognized the difficulty in establishing impairment to the defense and have held that "affirmative proof of particularized prejudice is not essential to every speedy trial claim." See Doggett, 505 U.S. at 654-55 (finding delay of eight-and-a-half years between indictment and arrest caused by government's negligence to be "excessive" and a violation of defendant's speedy trial rights though defendant could not demonstrate specific prejudice). Nevertheless, in the majority of cases, "courts will still look for a demonstration of actual prejudice." Easterly, 77 S.W.3d at 238; Wood, 924 S.W.2d at 348; State v. Roger David Browder, No. 02C01-9606-GS-00201, 1998 WL 47877, at *5 (Tenn. Crim. App., Feb. 9, 1998) ("[E]ven though affirmative proof of particularized prejudice is not essential to every speedy trial claim, . . . we find it difficult to evaluate the degree to which the delay prejudiced the defendant absent some specific information about the deprivations which he incurred.").

Here, the Petitioner argues that the seven-year-delay in his case caused prejudice to him by impairing his defense. Specifically, he asserts that he was unable to obtain his employment records to establish his alibi or that he was not in Dickson at the time the offenses were alleged to have occurred. He further generally contends that witness memories diminished and that he was prohibited from effectively cross-examining them. We agree with the post-conviction court and conclude that the Petitioner has failed to establish any such prejudice. First, as early as 2001, the TBI requested the Petitioner's employment records as part of their investigation and were advised that they did not exist at that time. As pointed out by the post-conviction court, the fundamental flaw in the Petitioner's argument is that he did not put forth any proof as to whether these records ever existed or when they may have existed. Moreover, as the proof from both of the Petitioner's trials demonstrates, the Petitioner clearly received the benefit of the child victims' faded memories in this case. To be clear, Victim B could not remember the Petitioner's name, much less any specifics about the offense. As we see it, the delay helped rather than hindered the Petitioner's case. Based on the record, we cannot conclude that the Petitioner's ability to prepare a defense was impeded by the delay.

After applying the Barker balancing test, we agree with the post-conviction court and conclude that the Petitioner has failed to establish by clear and convincing evidence that third counsel was ineffective in refusing to file a motion asserting his rights to a speedy trial had been violated. Although the lack of due diligence by the State was not appropriate, the delay in the proceedings was not unreasonable given the complexity and seriousness of the case. Further, the Defendant failed to establish any prejudice to his defense as a result of the delay.

**3. Testimony of Veronica Gomez and Sue Ross.** The Petitioner argues that third counsel was ineffective by failing to object to the testimony of Veronica Gomez, a social worker, and Sue Ross, a nurse practitioner, as inadmissible hearsay. Specifically, he argues that "nothing in [the social worker's] testimony indicates that the [victims] made any excited utterances" and that no exceptions to the hearsay rule apply. The Petitioner further argues that third counsel failed to require the trial court to conduct a hearing pursuant to Rule 803(4) of the Tennessee Rules of Evidence. He insists that the statements of the nurse and the social worker were testimonial and not made for the purpose of medical diagnosis and treatment. He further claims these statements were admitted at trial in violation of the Confrontation Clause. In response, the State contends that the Petitioner has waived his Confrontation Clause claim because he did not identify the Confrontation Clause as a basis for relief to the post-conviction court, he failed to mention the Confrontation Clause in his initial petition, and failed to list it in his Amended Petition as a basis for challenging Ms. Gomez's and Ms. Ross's testimony. In regard to the Petitioner's hearsay basis for the ineffective-assistance claim, the State insists that the Petitioner did not establish that third counsel was constitutionally compelled to raise the hearsay objection and, even more importantly, that the motion would have had a reasonable probability of altering the outcome of trial.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Rule 802 states that "hearsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. "Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule—are questions of law subject to de novo review." Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015).

Tennessee Rule of Evidence 803(4) provides: "Statements made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment." This rule requires either that (1) the statement must have been made for the purposes of diagnosis and treatment, in effect describing medical history, past or present symptoms, or pain or sensations, or (2) the statement must address the cause or source of the problem if reasonably pertinent to diagnosis and treatment. State v. McLeod, 937 S.W.2d 867, 870 (Tenn. 1996). This hearsay exception is justified because "the declarant's motive of obtaining improved health increases the statement's reliability and trustworthiness." State v. Barone, 852 S.W.2d 216, 220 (Tenn. 1993). In addition, "if physicians or other medical personnel rely upon the statement in diagnosing and treating the patient, then the statement should be sufficiently trustworthy to be admissible in a court of law." McLeod, 937 S.W.2d at 870 (citing Barone, 852 S.W.2d at 220; State v. Edwards, 868 S.W.2d 682,

699 (Tenn. Crim. App. 1993)). Moreover, this court has held that a child abuse victim's statement to a physician identifying a perpetrator is reasonably pertinent to diagnosis and treatment when the perpetrator is a member of the victim's immediate household because physicians have a duty to prevent an abused child from being returned to a place where he or she cannot be adequately protected from further abuse and because such statements are relevant in diagnosing and treating the child. State v. Rucker, 847 S.W.2d 512, 518-20 (Tenn. Crim. App. 1992), declined to follow on other grounds by McLeod, 937 S.W.2d at 870 n. 2.

In order to determine the admissibility of a statement made by a child-declarant pursuant to Rule 803(4), the trial court is required to conduct an evidentiary hearing outside the jury's presence. McLeod, 937 S.W.2d at 869. When determining whether a child's statement qualifies for a hearsay exception under Rule 803(4), the trial court "must consider criteria such as the circumstances surrounding the making of the statement," including "the timing of the statement and its contents," whether "the statement was inappropriately influenced by another," whether the statement "was in response to suggestive or leading questions," and whether there were any other factors that might "affect trustworthiness, such as a bitter custody battle or family feud." Id. at 871.

In regard to this issue, the post-conviction court engaged in an exhaustive analysis of the applicable law and denied relief reasoning as follows:

> The Court of Criminal Appeals observed that the statements made by the victims to Ms. Gomez and Ms. Ross "may have been excludable as hearsay" and found that Petitioner's trial counsel made no objection to the admission of the testimony. It, therefore, ruled that the jury was free to consider such testimony as substantive evidence of Petitioner's guilt.

> The statements by the victims made to both Ms. Gomez and Ms. Ross were made some seven (7) weeks after the event. These extrajudicial statements were obviously hearsay.

> * * *

> Because of penile/vaginal penetration of both victims, examination is generally required for injury or venereal disease. The identity of the perpetrator is necessary to determine the existence of a continuing threat to the victims. Whether this was true in this case is not known because the transcript of Petitioner's trial is not in the record. If a transcript of Petitioner's trial had been included in this record, this Court could have

-28-

reviewed the entire testimony of Ms. Gomez and Ms. Ross to determine whether the facts contained therein would have sustained the admissibility of this evidence or not. This Court could possibly have determined whether or not the facts were sufficient for the trial court to have made the findings required at a jury-out hearing. However, without the transcript, we do not know.

Trial counsel was ineffective in not objecting to this hearsay testimony and, apparently, not requesting a jury-out hearing. Petitioner has not demonstrated prejudice from this failure, however, as he has not shown whether or not the evidence would have been admissible. A petitioner must prove actual prejudice resulting from the deficient performance. Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993).

In resolving this issue, the State correctly notes that the Petitioner failed to include the Confrontation Clause as a ground for relief before the post-conviction court. In its order denying relief, the post-conviction court noted that "the issue of denial of confrontation under Crawford v. Washington, 541 U.S. 36 (2004) was not addressed by Petitioner and this Court renders no opinion thereon." The Petitioner is not permitted to argue this ground for relief for the first time in this appeal. Therefore, it is waived.

Additionally, the record shows that third counsel did in fact object to the testimony of the nurse practitioner, albeit on different grounds. Third counsel objected to the testimony of the nurse practitioner because she was not a medical doctor and could not provide a medical opinion, which was overruled by the trial court. The nurse practitioner then testified as an expert in the area of child sexual abuse. Following the disclosure of abuse, she performed a physical examination of the victims on August 10, 2001. She explained her findings as memorialized on the victims' medical records to the jury. Asked to provide Victim A's medical history and the diagnosis and treatment, the nurse replied, "[Victim A] at the time that I saw her was six and referred to us because of allegations of sexual abuse. . . . [She] was brought into the clinic by her other [grandmother] because she had disclosed that she had been sexually abused by a maternal grandfather." [Victim A] disclosed "digital/genital penetration and then pen[ile]/digital [penetration]" by "Papa Buddy." The nurse explained this meant the child was referring to the perpetrators fingers inside of her genital area and then being made to touch his penis. She noted that "the exam[s] were both normal." She said that it was "very unusual to see any specific injury" in sexual abuse examinations and that such a finding did not mean that the abuse did not occur. She confirmed, through the medical records of [Victim B], that she was five years old at the time of the exam. She said that [Victim B] was the child who presented first at Vanderbilt Hospital for another reason. [Victim A] disclosed over the phone and later came to hospital. [Victim B] disclosed the same

digital/genital penetration or being made to touch her maternal grandfather's penis and penile/genital contact. She noted that [Victim B] said that the Petitioner "put his finger inside of her and also reported that he put his private part on her belly button and said it felt like he was putting warm stuff on her tummy." Veronica Gomez testified that she interviewed the victims as part of her employment as a social worker at the Department of Children Services in 2001. On August 1, someone reported a concern regarding the victims, and she responded within twenty-four hours. She interviewed the victims on August 7, 2001. She testified that [Victim A] disclosed "actual sexual penetration with the - by the penis," and [Victim B] disclosed digital penetration.

Although the timing of the above statements was some seven weeks after the reported abuse, we conclude that the statements would have been admitted pursuant to Rule 803(4), for purposes of medical diagnosis and treatment. The statements do not appear to be inappropriately influenced by another or in response to suggestive or leading questions. See State v. Edwards, 868 S.W.2d 682, 699 (Tenn. Crim. App. 1993) (holding that victim's medical records were properly admitted under Tenn. R. Evid. 803(4) where victim reported only digital vaginal penetration and where treatment ultimately proved to be unnecessary); State v. Steve Gass, No. M2000-02008-CCA-R3-CD, 2002 WL 29477, at *8 (Tenn. Crim. App. Jan. 9, 2002). The record also does not contain any other factors that might affect the trustworthiness of the statements, such as a bitter custody battle or family feud. McLeod, 937 S.W.2d at 871. Given the above testimony at trial, we are unable to conclude that the Petitioner's case was prejudiced as a result of third counsel's deficient performance. Therefore, he is not entitled to relief on this issue.

**4. Failure to Object to the "Silent" testimony of the [Victim B].** The extent of the Petitioner's two-sentence argument in support of this issue is as follows: "Trial counsel was also ineffective in failing to object to the 'silent' testimony of [Victim B] at trial. [Victim B] testified to a lack of memory." The Petitioner does not provide any argument or citations in support of this issue. It is therefore waived.

**5. Prosecutorial Misconduct.** The extent of the Petitioner's argument supporting this issue is as follows: "The prosecutor in this case presented evidence that [the Petitioner] had an escape charge. It is unprofessional conduct for a prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw." The Petitioner also generally complains about the State's making "excuses" for the victims' grandmother's inconsistent testimony. In regards to this issue, the State contends that the post-conviction court properly denied relief because the record is "replete with evidence that the [Petitioner] did, in fact, have an escape charge." The post-conviction court determined, and we agree, that the Petitioner failed to carry his burden on this issue. As noted by the State, the record shows that the Petitioner was charged

with escape because he did not return to the jail after being dropped off at the VA hospital by an Assistant Public Defender. More significantly, the record shows that prior to each of the Petitioner's trials, third counsel filed a motion in limine to prevent the State from mentioning the escape charge. The trial court limited the State to introducing only the facts supporting the escape offense and prohibited any mention of the actual escape charge. The Petitioner does not reference in the record where the prosecution makes excuses for the victims' grandmother's inconsistent testimony nor does he say how he was prejudiced by this issue. We therefore consider this aspect of his issue waived. The Petitioner has failed to establish deficient performance or prejudice in regards to this issue. He is not entitled to relief.

6. **After Hours Proceedings.** The Petitioner argues that third counsel failed to object to the "unusual start time" for the trial in this case, which resulted in a "hasty" verdict. Citing State v. Susan Jo Walls, M2014-01974-CCA-R3-CD, at *20 (Tenn. Crim. App. Apr. 7, 2016) perm. app. granted (Tenn. Aug. 18, 2016), he contends that "the presentation of evidence in this case began sometime after 7:39 pm on a Friday" and that the jury returned its verdict at 12:23 a.m. In response, the State contends that the post-conviction court properly denied relief because the Petitioner failed to present any evidence of the late night hour of the proceedings and failed to ask the post-conviction court to take judicial notice of the transcripts.

The State properly notes that the Petitioner failed to provide the post-conviction court with any proof on this issue. We further acknowledge that the post-conviction court repeatedly referred to its lack of a transcript of the trial throughout its order denying relief. Even so, our review of the February 2011 trial transcript shows that proceedings in this case began "at 7:39 p.m." Nearing the close of the proof, the jury was called back into court to hear an affidavit from the Assistant Public Defender read into evidence at 10:52 p.m. Closing arguments were held, jury instructions given, and the case was submitted to the jury. The jury returned their verdict at 12:23 a.m. In Susan Jo Walls and the cases cited therein, there were circumstances in addition to the late-night hour of deliberations upon which the court relied in granting a new trial. Because the Petitioner did not put on any proof at the post-conviction hearing in regard to this issue, he is not entitled to relief.

7. **Severance of the Indictment**. The Petitioner argues that third counsel was ineffective by agreeing to sever this case into groups of four counts. The post-conviction court determined that third counsel made an "affirmative tactical decision" in agreeing to the severance and that she agreed to the severance to prevent prejudice to the Petitioner from the jury's learning that he had been charged with eighty counts of sexual abuse. The post-conviction reasoned that there was no proof in the record showing that third

counsel did not adequately prepare for trial and opined that her strategy was "sound" and would have been "ineffective" had she not sought the severance.

A defendant has an absolute right to severance of offenses that have been permissively joined pursuant to Tennessee Rules of Criminal Procedure 8(b)(2) unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the state's case-in-chief upon the trial of the other(s). Tenn. R. Crim. P. 14(b)(1); Advisory Commission Cmts. See Spicer v. State, 12 S.W.3d 438 (Tenn. 2000) (discussing consolidation versus severance of offenses and holding that trial court's consolidation of indictments over defendant's objection was harmless error); see also State v. Hallock, 875 S.W.2d 285, 289-90 (Tenn. Crim. App. 1993) (noting that "[f]ailure to sever . . . invited reliance upon the 'propensity' notion: that is, if he did it to one, he did it to the other" but holding that trial court's failure to sever sex offense was harmless error).

Upon our review, we agree with the post-conviction court and conclude that the Petitioner has failed to demonstrate that third counsel was ineffective by agreeing to the severance in this case. To the extent that the Petitioner argues that these offenses should have been mandatorily joined and consolidated in a single trial, we disagree. The mandatory joinder rule applies only to "same conduct" and "same criminal episode" offenses, neither of which are involved in the case sub judice. While we do not agree with subjecting the victims or the Petitioner to twenty trials, the record shows that third counsel was concerned the jury would convict the Petitioner based on the "propensity" notion. She agreed to the severance to prevent the jury from hearing the voluminous counts of sexual offenses in the indictment, which cannot be said to be deficient. State v. Johnson, 342 S.W.3d 468, 472 (Tenn. 2011) (noting that "[b]oth the prosecution's and the defendant's decisions regarding joinder and severance are influenced by a range of practical and tactical factors, including the merits of the individual cases, the readiness of the cases for trial, the defendant's right to a fair trial before an impartial jury (uninfluenced by evidence of other offenses), the cost and delay of multiple trials, and the desire to resolve all the charges with dispatch) (internal citations and quotations omitted)). Under the above law, severance of the counts in the indictment was proper. Accordingly, the Petitioner has failed to demonstrate that third counsel provided deficient performance or that his case was prejudiced as a result. He is not entitled to relief on this issue.

For each of the grounds supporting the Petitioner's ineffective assistance of counsel claims, he also includes in this post-conviction appeal an identical stand-alone claim for relief. Each of these claims must be dismissed, in short order, on procedural grounds. Tennessee Code Annotated Section 40-30-106 (g) states that "[a] ground for [post-conviction] relief is waived if the petitioner personally or through an attorney failed

to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented" with certain exceptions which do not apply here. In his direct appeal, the Petitioner failed to raise issues (1) whether the more than nine-year delay from indictment to trial violated Appellant's right to a speedy trial as guaranteed by the Tennessee and United States Constitutions; (2) whether constitutional protections against double jeopardy barred Appellant's retrial after being acquitted at the first trial; (5) whether prosecutorial misconduct by the State deprived the Petitioner of due process of law; (6) whether the trial court's highly unusual start time for the trial, coupled with the late-night hour of trial/deliberations, deprived the Petitioner of effective assistance of counsel and due process; (7) whether the trial court's failure to require an election of offenses deprived the Appellant of a unanimous jury verdict; and (8) whether the confrontation clause was violated by admission of a nurse practitioner and child sexual abuse advocate hearsay testimonial evidence. Accordingly, issues (1), (2), (5), (6), (7), and (8) have been waived. In addition, issues raised on direct appeal are not cognizable on post-conviction review. See T. C. A. § 40-30-106(f), (h). The Petitioner challenged the sufficiency of the convicting evidence in his direct appeal, and he cannot collaterally attack this court's decision denying relief on that ground through a post-conviction petition. Therefore, issue (9), whether the evidence at trial was sufficient, has been foreclosed. In his final two issues, the Petitioner argues that the cumulative effect of the errors deprived him of a fair trial and that the post-conviction court's failure to review the transcript contained in its records violated the Petitioner's right to procedural due process. Because none of the Petitioner's issues amount to error, he is not entitled to relief.

## CONCLUSION

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE

-33-